A90A0985. PATE v. GEORGIA SOUTHERN & FLORIDA
RAILWAY COMPANY.
(395 SE2d 604)

Birdsong, Judge.

Appellant, Michael A. Pate, appeals the order of the trial court granting summary judgment to appellee railroad.

Appellant and his passenger, Spires, were en route to visit some friends when appellant's vehicle struck appellee's train at the 117th car at a railroad crossing. The evidence is in conflict whether the train was moving or stationary at the time; appellant asserts the train was stopped or he would have heard it.

It was about 1:15 a.m. and cloudy. It had rained two or three hours earlier, and appellant testified in his deposition that the pavement was still wet. There was no fog, and there were no other atmospheric conditions which would affect a driver's visibility. Appellant had not driven down the road before. He was unsure whether he was driving using his high or low beams, but believed he probably was using high beams. He testified he was traveling at 40-45 miles per hour.

Before approaching the railroad crossing there are three rolling hills but no curves or embankments that would block the view of the crossing. The railroad crossing lies on the road at the bottom of the third hill; the road from the third hill to the tracks is straight and a relatively level downgrade. By appellant's calculations, it is at least one-tenth of a mile from the top of the third hill to the track. In daylight a train can be seen at the crossing at a distance of approximately 1,100 feet; but in the evening there are no street lights or secondary lights once a driver has crested the third hill. Shrubbery has been cleared from the area since the accident, and the whole train track can now be seen.

At a distance of approximately 579 feet from the crossing there was a reflectorized orange railroad warning sign. Appellant makes no claim that this sign either was not visible from the road or was not in good condition. Appellant made a judicial admission in his deposition that he did not see this sign, and that if he had seen it, he would have recognized the sign, realized there were tracks ahead, slowed down, and stopped. The only reason appellant advances as to why he did

not see this warning sign is that he and the passenger were talking.

The next warning sign painted in white paint on the right-lane side of the road was approximately 345 feet from the crossing; this sign was about 52 feet in length. Appellant admits that he did not see this sign and asserts that because it was dark and the pavement was still wet from the rain, "everything was . . . reflecting off the road."

At a distance of approximately 60-75 feet from the crossing, there was a sign on the right-lane side of the road, since removed, that read "Georgia Law Stop Unsafe R. R. Crossing." Appellant contends this sign was so old, faded, and full of gunshot holes that appellee concedes it might not have been visible that night. Appellant did not see this sign.

At 43 feet from the crossing, there was a reflectorized red stop sign on the right-lane side. Appellant did not see this sign before the collision.

A white stop bar also was painted across the right lane approximately the same distance from the track as the stop sign, and approximately 30 feet from the track, there was a standard, white, reflectorized, railroad crossbuck sign. Appellant did not see these signs before the collision.

The record also contains a series of photographs showing a train visible at the crossing, during daylight hours, at various distances ranging from 100 to 1,100 feet.

Although appellant was unsure whether his vehicle left any skid marks, the uncontradicted evidence of record reflects that his vehicle left approximately 69 feet of skid marks from the point on the road where the marks started to the point where appellant's car left the road. The vehicle then traveled, at a slight angle, from the point where it left the road for approximately 42 feet more, crossing a culvert and going airborne before hitting the train; traveling an approximate distance, not counting the distance traveled during perception, recognition and reaction time, of 111 feet.

Although appellant testified in his deposition that there were small trees and high shrubbery near the tracks and that the land has been cleared since the collision, he did not testify that this foliage prevented him from seeing the crossing on the evening of the collision.

At the time of the collision, appellant admits in judicio, by way of his deposition testimony, that he had turned his head toward and was talking with his passenger. The passenger suddenly hollered "[t]here's a train." Appellant claims that although he saw only the shadow of the train, and not the train itself, he locked the brakes. He further testified that "when [he] got close enough *for [his] headlights to hit* [the train], [he] turned to the left to keep from hitting it"; and that he "didn't actually see [the] train *until [his] headlights hit it.*" (Em-

phasis supplied.)

Appellant opined that the reason for the accident was because the train was motionless on the tracks, it was dark at the crossing, and the railroad had not placed any type of flashing lights at the crossing. *Held*:

1. On summary judgment, movant has the burden of showing there is no genuine issue as to any material fact and that he is entitled to a judgment as a matter of law. When, as in the case sub judice, movant is the defendant, he has the additional burden of piercing the plaintiff's pleadings and affirmatively negating one or more essential elements of the complaint. In ruling upon a motion for summary judgment, the benefit of all reasonable doubt should be given to the opposing party, and the court should construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion. *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 595-596 (370 SE2d 843).

2. At the onset, we note that appellant first testified unequivocally in his deposition that in getting directions to his friend's house "[t]hey told me to cross the railroad tracks and go down to the dirt road on the right." And when asked, immediately thereafter, if he had been told to "[c]ross the railroad tracks and [the location] would be the first dirt road to the right," appellant gave an affirmative reply. But after being confronted with the fact that he then knew about the tracks that night, appellant apparently attempted to recant this testimony. Thereafter he testified, "I'm not saying they definitely told me, because I don't remember them telling me," "I'm not going to say they did," and that he "didn't remember there [were] railroad tracks there."

We find that, as to the issue whether appellant had prior knowledge of the existence of railroad tracks on the route he was traveling before he would reach his destination, appellant's testimony is contradictory within the meaning of *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (2) (343 SE2d 680). In a summary judgment case, where either a movant's or a respondent's explanation for a contradiction in his evidence is determined to be unreasonable (or no explanation is presented at all), the court must *eliminate* the favorable portions of the contradictory testimony *as it then stands*, and construe the evidence as to that issue in favor of the other party. *Prophecy Corp.*, supra; *Gentile v. Miller, Stevenson &c.*, 257 Ga. 583 (361 SE2d 383). Accordingly, as to the issue of whether he had been informed, before the collision, of the existence of the railroad crossing somewhere on the route, we will apply the rule of *Prophecy Corp.* against appellant.

3. Appellant makes no assertions that appellee railroad either failed to erect and maintain the statutorily required crossbuck sign at

the highway grade crossing, or failed to give an adequate warning signal as its locomotive approached the crossing. See generally OCGA §§ 46-8-190; 46-8-194; 46-8-196. Nor does the record establish such deficiencies.

In Georgia, "there must be unusual or special circumstances at a crossing before a railroad has the duty to warn of something as starkly obvious as a train; or, *conversely*, before a driver is excused from not seeing something plainly visible within the range of the statutory headlights requirement. In the absence of such special circumstances, the duty to warn does *not* arise and the sole proximate cause of the collision is the negligence of the driver." (Emphasis supplied.) *Seaboard Coast Line R. Co. v. Sheffield*, 127 Ga. App. 580, 581 (194 SE2d 484).

In determining whether unusual or special circumstances existed within the meaning of *Sheffield*, the issue whether the train was moving is not dispositive. The most that can be said is that a moving train is easier to hear, and can, under certain conditions, be easier to see due to the intermittent blocking and unblocking of the skyline behind the train as the railroad cars move. But this is merely a factor to be weighed and does not per se render the circumstances existing at a crossing "unusual or special." "The *mere act* of stopping railroad cars on a crossing for such a length of time as might be reasonably necessary in the conduct of the railroad's business would not constitute negligence on the part of the [appellee]. Other facts must be shown, to place on a railroad and its employees the duty to give the traveling public warnings of the presence of the train on the crossing, in addition to that which is given by the train itself." *Atlantic Coast Line R. Co. v. Marshall*, 89 Ga. App. 740, 743 (2) (81 SE2d 228). See *Wood v. Atlantic Coast Line R. Co.*, 192 FSupp. 351, 355 (4) (M.D. Ga.), affd. 290 F2d 220 (5th Cir.)

Thus assuming for purposes of the summary judgment issue before us that the train was stopped on the tracks at the time of the collision, this factor standing alone establishes no negligence on the part of appellee railroad. Incidentally, the record is totally silent of any evidence that such stopping, assuming as we do that it in fact occurred, was for any length of time other than that reasonably necessary to perform necessary railroad business.

Appellant, in essence, claims that the totality of the circumstances, including the darkness of the night, the cloudy sky, the wet pavement, the stopped train, and his unfamiliarity with the road, created a jury question as to whether "unusual or special circumstances" existed within the meaning of *Sheffield.*

We have held in cases where atmospheric conditions of fog, murk, smoke, mist, or rain affected the driver's vision so as to prevent him from seeing a crossing already occupied by a train until it was too late

to stop, that the driver's familiarity or lack of familiarity of the presence and location of the crossing is a determinative factor; but, where there is nothing shown which prevented the driver from seeing the crossing in time to stop if it was occupied and obstructed, whether the driver was familiar with the crossing is hardly material. *Georgia Northern R. Co. v. Stains,* 88 Ga. App. 6, 11-12 (75 SE2d 833), overruled on other grounds, *Atlantic Coast Line R. Co. v. Coxwell,* 93 Ga. App. 159, 164 (91 SE2d 135); compare *Georgia Northern R. Co. v. Dalton,* 133 Ga. App. 34, 36 (209 SE2d 669). In this instance, we find appellant's unfamiliarity with the road to be merely an additional factor to be weighed in determining whether a genuine issue exists as to whether the crossing was "unusual or special." In this regard, while appellant may have been unfamiliar with the road, he was on notice that a railroad crossing would be situated across the road before he reached his destination. See Division 2 above. Moreover, a driver who is unfamiliar with the road he is traveling, as a general rule, should exercise even greater caution and alertness, so as to be prepared for the unknown and unexpected.

Further, the evidence is uncontradicted that *it was the passenger and not appellant who first saw the train and sounded the warning, and that the train was visible at a distance beyond the statutory headlight requirement for low beams.* See generally OCGA § 40-8-30 (2) (low beams must reveal vehicles at a distance of at least 100 feet).

Additionally, appellant admits that he was talking with and looking at the passenger when the train was spotted by the passenger. Appellant further maintains even then that he saw only the train's shadow, and could not actually see the train until it subsequently was within the range of his headlights, at which time he veered his car left to avoid a head-on collision. These admissions uncontrovertedly establish that the train was visible to an alert person *before* appellant saw it; and, that the presence of the train *could be detected* before the train was in the range of headlights being used on appellant's vehicle. Compare *Suib v. Seaboard Systems R.,* 185 Ga. App. 713 (365 SE2d 842) and *Wood v. Atlantic Coast Line R. Co.,* supra at 353 (2). See generally OCGA § 40-8-30 (2).

Viewing the attendant circumstances in their entirety, we find as a matter of law that "unusual or special circumstances" did not exist at the crossing, within the meaning of *Sheffield,* supra; and accordingly, appellee railroad had no duty to warn appellant of something as starkly obvious as a train.

"[S]ummary judgment law does not require the defendant to show that no issue of fact remains, but rather tha[t] no genuine issue of material fact remains; and while there may be some shadowy semblance of an issue, the case may nevertheless be decided as a matter of law where the evidence shows clearly and palpably that the jury

could reasonably draw but one conclusion." (Citations and punctuation omitted.) *McCray v. Hunter*, 157 Ga. App. 509, 511-512 (277 SE2d 795).

Judgment affirmed. *Banke, P. J., and Cooper. J., concur.*

DECIDED JUNE 19, 1990 —
REHEARING DENIED JULY 3, 1990.

*P. Dewey Gill, Robert H. Malone III,* for appellant.
*J. Steven Stewart,* for appellee.